[No. 6,208.—In Bank.]
October 12, 1882.

# SAMUELLA CROSBY v. PATRICK DOWD ET AL.

STATUTE OF LIMITATION AGAINST MINOR—RIGHT TO MAINTAIN EJECTMENT AFTER REMOVAL OF DISABILITY—RUNNING OF STATUTE OF LIMITATIONS.—Action in ejectment commenced April 21, 1877, by the plaintiff, a daughter and heir at law of one S. J. Crosby, who, at the time of his death on the twenty-ninth day of March, 1859, owned the land, a part of a Mexican grant for which a patent was issued by the United States Government, on the nineteenth day of February, 1868. The plaintiff was born February 26, 1859. Crosby's possession of the property was not invaded in his life-time. Letters of administration upon the estate of S. J. Crosby, deceased, was issued to one Reed, prior to 1860. Reed tendered his resignation of the office, June 28, 1860, and it was accepted on the eleventh of August of the same year. Beach succeeded Reed as administrator by appointment made May 8, 1866, and he resigned April 2, 1870. From April 2, 1870, to January 3, 1876, there was no administrator; but upon the last-named day one Smith was appointed. The appellants contend that adverse possession commenced in 1866, and that the Statute of Limitations commenced to run on the issuance of the patent February 19, 1868.

*Held:* 1. Under the law in existence when the alleged ouster in this case occurred, and when it is claimed the Statute of Limitations began to run, the sole right to the possession of the property was in the administrator; and prior to January 1, 1873, the heir could not maintain an action for the recovery of the possession of the property, even though there was a vacancy in the administration, and the plaintiff was by law prohibited from asserting her right.

2. At the time it is claimed the Statute of Limitations began to run—February 19, 1868—the plaintiff was less than ten years old. It is true there was then an administrator of the estate of her ancestor, in the person of Beach, and that he could have commenced and maintained an action against the intruder for the possession of the property. But on the second of April, 1870, a vacancy in the administration occurred, and that vacancy continued until after the lapse of five years from the nineteenth of February, 1868. During this time there was no one in existence capable of bringing the action. The plaintiff was likewise legally incompetent to cause the appointment of an administrator to represent the estate, as well as to compel action, if there had been one. She could not be divested of her property by adverse possession held under such circumstances.

3. That under the provisions of Section 328 of the Code of Civil Procedure which reads : "If a person entitled to commence an action for the recovery of real property, or for the recovery of the possession thereof; or to make any entry or defense founded on the title of real property, or to rents or services out of the same, be, at the time such title first descends or accrues, either : " 1. Within the age of majority; or 2. * * *

The time during which such disability continues is not deemed any portion of the time in this chapter limited for the commencement of such action, or the making of such entry or defense, but such action may be commenced, or entry or defense made, within the period of five years after such disability shall cease, or after the death of the person entitled who shall die under such disability; but such action shall not be commenced, or entry or defense made, after that period." · The plaintiff in this action is not barred by the Statute of Limitations, but she might have instituted the action at any time within five years after the removal of her disability.

A DECREE OF FORECLOSURE OF MORTGAGE MUST CONTAIN SPECIFIC DESCRIPTION OF PROPERTY—UNCERTAINTY IN DESCRIPTION.—The defendants also claimed to have acquired the title of S. J. Crosby through foreclosure proceedings in an action of *Overfeldt* v. *Crosby*. The land directed to be sold is thus described in the decree of foreclosure, as also in the complaint in the action and in the mortgage itself: "All of that part of the rancho situated in the county of Santa Clara, in the State of California, called the Santa Rita, described in the three following deeds, to wit: In a deed dated February 15, 1855, from Secundino Robles and Antonio Garcia, his wife, Miguel Espinosa, Jesus Robles, his wife, to Samuel J. Crosby, filed for record in the County Recorder's office of Santa Clara county, on the sixteenth day of February, 1855, and recorded in Book ' H' of Deeds, page 405, and re-recorded March 10, 1855, and in Book ' G' of Deeds, page 477; also, a deed dated May 5, 1855, from one Teodoro de Jesus Robles to Samuel J. Crosby, filed for record in said Recorder's office May 7, 1855, and recorded in Book ' G' of Deeds, page 509; and also a deed dated this tenth day of March, 1856, from Don Teodoro de Jesus Robles to Samuel J. Crosby, filed for record in said Recorder's office on the eleventh day of March, 1856, and recorded in Book ' K ' of Deeds, page 188, to which deeds reference is made for a more particular description of the premises."

*Held:* 1. The primary purpose of an action of foreclosure is to enforce a lien upon certain specific premises. The first step in that proceeding, under our system, is the filing of a complaint. That complaint must contain a description *prima facie* at least sufficient for the identification of the property. There must be such a basis for the decree that is to follow, to rest on. While it is generally sufficient to describe the premises as they appear in the mortgage itself, this is only so when the mortgage itself contains a description—not where, as here, the mortgage contains *no* description, but only a reference therefor to other instruments, from which a description may or may not be obtained. If the description contained in the mortgage involved in *Overfeldt* v. *Crosby*, was susceptible of being made definite and certain, that ought to have been done in the action foreclosing the mortgage. The decree should have put an end to all such uncertainties.

2. The defendants acquired no title under the foreclosure proceedings in the case of *Overfeldt* v. *Crosby*. Whether plaintiff could recover the entire premises if defendant Clarke had by adverse possession extinguished the title of the plaintiff's co-tenant, and himself thereby acquired title to the interest theretofore owned by the co-tenant, is a question

that need not be considered in this case, since it does not appear, either in the findings or proof, that Clarke has ever held adverse possession of the premises as against the plaintiff's co-tenant.

APPEALS by defendants from the judgments of the Twentieth District Court in and for the County of Santa Clara, from an order denying a motion for a new trial, from an order amending the findings of the Court, and from an order refusing to correct the findings.    BELDEN, J.

Action in ejectment.    The plaintiff was born February 26, 1859.    As to the defense of the Statute of Limitations relied on by the defendants; the other facts are stated in the opinion of the Court.    In support of their other defense and to show that the defendants had acquired the title of S. J. Crosby, the ancestor of the plaintiff, they introduced in evidence "*inter alia*" the judgment roll in an action of *E. Overfeldt* v. *S. J. Crosby,* and the findings of the Court below as to this branch of the defense was as follows:

"That during the life-time of S. J. Crosby, he made and executed to one E. Overfeldt, his note for the sum of one thousand five hundred dollars with interest, the same being secured by mortgage upon certain portions of the 'San Francisquito' ranch, in said mortgage described. ·

"That upon the twenty-third day of March, 1858, an action had been brought by said Overfeldt upon said note and mortgage, and such proceedings had thereunder, in the District Court of Santa Clara County; that upon said twenty-third day of March, 1858, judgment was rendered in favor of said Overfeldt and against S. J. Crosby for the sum of about two thousand dollars, and it was also adjudged that said mortgage be foreclosed and said mortgaged premises sold as by law provided, and that the proceeds of said sale be applied to the satisfaction of said mortgage.

"The only description of the premises mortgaged as given in said mortgage and complaint, and also in the decree in said cause entered, was as follows: 'All of that part of the rancho situate in the County of Santa Clara, in the State of California, called Santa Rita, described in the three following deeds, to wit: In a deed dated February 15, 1855, from Secundino Robles and Antonia Garcia, his wife, Miguel Es-

pinosa, Jesus Robles, his wife, to Samuel J. Crosby, filed for record in the County Recorder's office of Santa Clara County on the sixteenth day of February, 1855, and recorded in Book 'H.' of Deeds, page 405, and re-recorded March 10, 1855, in Book 'G.' of Deeds, page 477; also, a deed dated May 5, 1855, from one Teodoro de Jesus Robles to Samuel J. Crosby, filed for record in said Recorder's office May 7, 1855, and recorded in Book 'G.' of Deeds, page 509; and also a deed dated this tenth day of March, 1856, from Don Teodoro de Jesus Robles to Samuel J. Crosby, filed for record in said Recorder's office on the eleventh day of March, 1856, and recorded in Book 'K.' of Deeds, page 188, to which deeds reference is made for a more particular description of the premises.'

"That said deeds referred to for description were all duly recorded in the office of the County Recorder of said Santa Clara County, as indicated by the reference in said mortgage, and said deeds so referred to and recorded contained a full and complete description of the premises in dispute in this action and at this trial.

"That upon this decree an execution or order of sale issued August 1, 1860, to the Sheriff of Santa Clara County.

"That due notice was given by said Sheriff as by law required, and thereafter, and upon the day fixed for said sale, the Sheriff sold the same at public auction, and said Overfeldt, being the highest and best bidder, the whole of said premises were sold to him by said Sheriff for the amount of said judgment, interest, and costs—less the sum of two hundred dollars, which the Sheriff returned upon the execution, as 'having been paid by said S. J. Crosby in his life-time.'

" The Sheriff gave notice of and made said sale in the manner stated in his return, indorsed upon said order of sale, a copy of which order of sale, with said return, is hereto annexed and made part of these findings, marked 'Exhibit C.' And the description in said return embraces the same land embraced in the description in the deeds referred to in the judgment of foreclosure for description, and is an accurate description thereof.

"The rancho heretofore referred to as Santa Rita is the same rancho heretofore elsewhere referred to as the San

Francisquito Ranch. No redemption was made of said property, and upon the twenty-eighth day of February, 1861, the Sheriff executed his Sheriff's deed to said purchaser, Elisha Overfeldt, for the property purchased by him at said sale. The judgment of Overfeldt upon which this sale was made, was in due form and time presented by said Overfeldt to the administrator of said estate for allowance, and was by said administrator, and thereafter by the Probate Judge, in due form and time, allowed, December 5, 1859. No order of any character was made by the Probate Court, or by the Probate Judge, permitting the execution to issue under which the sale was made under the Overfeldt judgment.

"May 22, 1861, Elisha Overfeldt executed to Jeremiah Clarke his deed of conveyance of all the lands described in said Sheriff's deed of February 28, 1861. The lands described in said Sheriff's deed and included therein, and also the lands included in the deed from Overfeldt to Clarke embrace all the lands here in controversy.

"18th.—At the date of the purchase by J. Clarke from Overfeldt, of May 22, 1861, Clarke took possession of the tract in said deed described, save and except Mayfield Farm then in possession of Wallis and wife, and excepting another tract of eighty acres then occupied by Patrick Dowd, as the agent or tenant of McGarahan. The tract so occupied by Dowd was part of the tract described in the deed from Overfeldt to Clarke.

"Upon the twenty-seventh of March, 1866, Clarke executed to Dowd a lease of the tract marked ' D ' on said plat, and containing two hundred and forty acres. Dowd took possession of said tract under said lease and has ever since occupied said tract as such tenant. Upon taking said lease Dowd (in 1866) surrendered to Clarke the eighty acres before that time occupied by him, and ever since that time (1866) the whole of said disputed premises has been held and occupied by said Clarke, or by his tenants holding under him by lease from him, said Clarke claims to hold the same under and by virtue of said deed from Overfeldt, and upon or under no other claim whatever."

The following are the material parts of the Sheriff's return of sale referred to above as " Ex. C :"

" Office of the Sheriff of the County of Santa Clara, ss. I hereby certify and return, that by virtue of the order of sale hereunto annexed, I did, after making the levy described in the indorsement by me made on said writ, to wit: on the twenty-fifth day of August, A. D. 1860, at twelve o'clock, noon, offer for sale the property described in said order of sale, at public auction, at the door of the Court-house, in the City of San José, in the County of Santa Clara, and State of California, after due and legal notice, and in full accordance with the law—said property being at said sale, and in the published notices of said sale, described as follows:

"All that tract of land situate in the County of Santa Clara, and State of California, and bounded and described as follows, to wit: Commencing at a point and stake at the south-west corner of lands claimed by Gaudalupe Robles, being about three eighths of a mile south of the road from San José City to San Francisco, in Fremont township, it being the starting point and place of commencement of lands conveyed to Samuel J. Crosby by Secundino Robles and wife, and Miguel Espinosa and wife, and José Teodoro Robles; thence south thirty-three degrees thirty minutes, west ninety-three chains and five links to a stake marked B on the north side of the Arroyo Matadero; thence following up said arroyo on the northerly bank until it reaches the fence or line of Maximo Martinez' lands; thence along the line of said fence, or line of said Maximo Martinez' land in a southerly direction to the road called the Arrastradero; thence along the northerly side of said road in an easterly or north-easterly direction to a stake on the north side of said road; said stake bears south fourteen degrees forty-five minutes east two chains and two links from a white oak tree twenty-eight inches in diameter; thence north sixty-six degrees fifteen minutes east thirty-five chains and thirty links to a stake; thence north forty-seven degrees thirty minutes east five chains and ninety-one links to a stake; thence north twenty-six degrees east fifty-eight chains and fifty-eight links to a stake; thence north nine degrees east eight chains and thirty-five links to the south-east corner of lands formerly owned

by E. O. Crosby, called Mayfield Farm; thence north fifty-six degrees thirty minutes west forty chains along the southwest side of Mayfield Farm to a stake; thence north thirty-three degrees thirty minutes east thirty chains and eighty-eight links to a stake; thence north fifty-six degrees thirty minutes west thirty-one chains and sixty-two links to the place of beginning; the above courses are true and not magnetic, and the above-described tract contains about one thousand acres, more or less.

"Also, all that other piece or tract of land situate in said County of Santa Clara, and adjoining the above, bounded as follows, to wit: Beginning at an oak tree marked C, standing in the northerly side of an arroyo, said tree being in the north-easterly corner of Mayfield Farm, and on the westerly side of the county road running from San José to San Francisco; thence north fifty-six degrees thirty minutes west along said road thirty-one chains and sixty-two links; thence at right angles south thirty-three degrees thirty minutes west thirty-one chains and sixty-two links; thence at right angles south-easterly thirty-one chains sixty-two links to the line of Mayfield Farm; thence along the line of Mayfield Farm thirty-three degrees thirty minutes east thirty-one chains and sixty-two links to the place of beginning; said tract containing one hundred acres, more or less."

The decree in the action of *Overfeldt* v. *Crosby* recites that it was entered by stipulation of agreement of all the parties in the cause made and filed in open Court.

Defendants' bill of exceptions in the present action, filed June 20, 1878, shows that the defendants on that day, by counsel, came and moved the Court below to correct the findings filed in this action on the eighth day of May, 1878, by inserting the word "claiming" in the last clause of the findings of fact, instead of the word "claims," as the same now appears therein. The plaintiff appeared by counsel and opposed said motion. It was shown to the Court that when the said findings were signed and delivered to the Clerk of the Court below to be filed on the morning of the eighth day of May, 1878, the said last clause of said findings of fact contained the word "claiming." That within about ten minutes afterwards, and before the Clerk had indorsed his filing

thereon, without any notice to the defendants, said word "claiming" was changed by the Judge of the Court to the word "claims," by striking out the letters "ing" therefrom, and inserting the letter "s" after the remaining letters "claim."

That the Clerk, by order of the defendants, made a copy of said findings and delivered the same to the defendants' counsel, after the said findings had been filed in which the word "claiming" appeared, as the same was originally written by the Judge before said change was made. And the defendants, or their counsel, did not discover that said change had been made until the thirteenth day of June, 1878, after an appeal had been taken to the Supreme Court from the judgment entered upon said findings on the said eighth day of May, 1878. The motion of the defendants was denied, and the defendants duly excepted.

The finding referred to in the bill of exceptions, is the one herein before given, and numbered eighteenth.

After the following opinions in this cause were delivered in bank, a petition for rehearing was denied.

*John Reynolds* and *S. O. Houghton*, for Appellants.

The objection that the description of the premises in the complaint is too indefinite to indicate with sufficient accuracy the property sought to have subjected to sale under the decree of foreclosure, is untenable. The deeds referred to for greater certainty in the description, being to the mortgagor and in his chain of title, no purchaser could fail to know what he was buying. Every purchaser is presumed to know the source and deraignment of the title he is purchasing.

It is settled in this State, that a description in a complaint by reference to a map is good because the map referred to is certain, and it has never been held necessary to annex a copy of the map to the complaint. And in a foreclosure the description in the complaint properly follows that in the mortgage, if it is sufficient, without being reformed. And if it contains a description, which requires reference to other records, whether maps or deeds, for greater certainty, it is nevertheless a description, and the record of the judgment is a perfect record in itself. The description involved in this

case, was a description, but one which required reference to other certain and definite records to make it more certain. It is as complete a description as if it had designated the land as the Robles ·farm, conveyed to Crosby, the mortgagor, by Robles, by deeds recorded, etc., and referring to those deeds for greater certainty. And this would be as complete a description as that in *Doll* v. *Feller*, 16 Cal. 432, which was an action of ejectment. See, also, *Wendell* v. *The People*, 8 Wend. 199; S. C., 22 Am. Dec. 635; *Piercy* v. *Crandall*, 34 Cal. 345; *Jackson* v. *Marsh*, 6 Cow. 281; *Umbarger* v. *Chaboya*, 49 Cal. 528; *Cornell* v. *Jackson*, 9 Metc. 150; *Wiswell* v. *Marston*, 54 Me. 270; *Cleaveland* v. *Flagg*, 4 Cush. 76.

And this Court, in *Vance* v. *Fore*, 24 Cal. 445–446, held that the description which is most stable and certain, and least likely to be affected by mistake, should be followed; and that a map or another deed, referred to for description, if certain and definite, would control the description by metes and bounds contained in the deed referring to it.

These were actions at law, not cases in equity, to correct mistakes or reform the descriptions. (*Davis* v. *Rainsford*, 17 Mass. 210 ; *Jackson* v. *Loomis*, 18 Johns. 81.) In the case of *Quivey* v. *Baker*, 37 Cal. 468, the mortgage, complaint, and decree of foreclosure contained a false description ; that is, a description of a lot not intended to be conveyed. But the Sheriff, in selling, pointed out and sold the lot intended to be described. This Court held that the decree and sale were not void, as to the lot intended to be described, but which in fact was not, and ordered the whole proceedings to be corrected, so as to conform to the intention of the parties.

(*a*) A mortgage is a conditional conveyance, and is governed in its construction by the same rules as absolute conveyances. In *Vance* v. *Fore*, 24 Id. 444, this Court, citing *Allen* v. *Bates*, 6 Pick. 460, and *Foss* v. *Crisp*, 20 Id. 121, says: "When one deed refers to another for a description of the granted premises, it is regarded as of the same effect as if the latter was copied into the deed itself." The foreclosure of a mortgage neither adds to nor takes from it any of its essential characteristics as a conveyance. All the covenants pass to the purchaser under the foreclosure sale, as if it were

an absolute conveyance, and the purchase was made directly from the mortgagor. (*Andrews* v. *Wolcott*, 16 Barb. 25.)

The purchaser deraigns his title through the mortgage. In *Clark* v. *Baker*, 14 Cal. 612, this Court held that a title acquired by the mortgagor after the mortgage, passed to the purchaser under the foreclosure. The purchaser at a foreclosure sale occupies the same relation to the property mortgaged as the mortgagor occupied, and a covenant which estops the mortgagor from claiming an after-acquired title, runs with the land, and enures to the benefit of the purchaser at the foreclosure sale. (Rawle on Covenants, pp. 335, 410; *Andrews* v. *Wolcott*, *supra*.)

In an action at law, when the Sheriff's deed upon which the title rests is found to have an inaccurate description, and the means of correcting it is found in the record, it will be corrected. (93 U. S. Rep. 523.) And if resort may be had to the record to correct the Sheriff's deed, surely resort may be had to the record and the mortgage, and the references which are proper to explain it, to support the Sheriff's deed when it and the sale are made in accordance with all such references.

The description in the mortgage is shown to be accurate and sufficient, and it needed no reformation or correction. And the complaint, following the same description, can not render the decree void, which follows the complaint.

If the description had not expressed the intention of the parties, it might have been corrected upon proper averments; but being already sufficient, no amendment was required. The purchaser at the foreclosure sale had the same means of knowing what he was purchasing that he would have had if he had purchased the property by the same description from S. J. Crosby directly.

The Indiana cases, upon which the plaintiff relies, hold that a description which is sufficient in the mortgage without amendment, is sufficient in the complaint and decree. And the courts of that State apply the same rules of construction to the description in the complaint as to that in a deed or mortgage. And they hold that the test of its sufficiency is that the officer can ascertain what property he is directed to sell. (*Nolte* v. *Libbert*, 34 Ind. 167; *Davis* v. *Cox*, 6 id. 481;

*Whittelsey* v. *Beall*, 5 Blackf. 143.) That certainly is the rule in this State.

In *Whittelsey* v. *Beall*, the Court holds the description in the mortgage and complaint to be so vague as to make the decree erroneous, but the Court says: "We do not mean to say that the description is so vague as to make the deed inoperative." In *Jackson* v. *Rosevelt*, 13 Johns. 96, the Sheriff under an execution at law had sold land by this description; "All the lands, etc., of Elizabeth Ellis and Sarah Van Kleek, heirs at law of Lawrence Van Kleek, situated in Hardenbergh's Patent." It also appeared that this patent covered lands in several counties. It further appeared that the land had been partitioned and the Sheriff might have ascertained the true description. And it was held that the officer in making the sale should have indicated to purchasers what property he was selling. It will be observed that in this case the Court goes outside of the record, to ascertain whether the description by which the sale was made was sufficient to inform purchasers of what land they were buying. Apply the same rule to our case and all objections are answered.

In the case at bar the Sheriff ascertained the exact description, from the records referred to in the mortgage and decree, under which he was proceeding, and he sold the land by a perfect description. The purchasers were therefore fully apprised as to what they were bidding on, as in *Quivey* v. *Baker*. It was agreed by the parties that the decree should be entered just as it was, leaving it to the officer to perfect the description from the records, which he did.

(*b*) That which is sufficient in the complaint must necessarily be sufficient in the decree.

And we submit that it is well settled in this State, that the description in this case is sufficient for a mortgage or complaint, and that no fault can be found in this decree. The maxim, *Id certum est quod certum reddi potest*, applies to decrees of foreclosure as well as to mortgages or other deeds. And such a decree is sufficiently certain, if it can be made so by public records referred to. (*Kelly* v. *McKibben*, decided by this Court Feb. 21, 1880, 5 P. C. L. J., 38.)

It is objected that this maxim has no application to judicial

proceedings, whose office it is to make that certain which was before uncertain.

(*a*) It may be answered, that it is not the office of a court of equity to incorporate into its decrees everything by which they are made certain. Nor does it reform descriptions which are made certain by reference to convenient circumstances of certainty. And we venture to say, that no decree can be found, containing a description of real property which is absolutely certain, without reference to something not actually incorporated in it.

We submit that this maxim applies to all forms of contract, relating to real estate, including grants of records and judgments. Kings' grants are records, and must be as complete as a judgment record, and a "king's grant shall be void if it be totally uncertain; but if a king's grant refers to another thing which is certain, it is sufficient." (Com. Dig., Title "Grant.")

We do not claim that this maxim applies to a judgment when the matter, to which resort must be had, requires averment and proof to bring it to the aid of an imperfect description. Nor does it, in such a case, apply to the description in a deed, when it is sought to be used as evidence without reformation in equity. An illustration of this is found in the case of *Davis* v. *Cox*, 6 Ind. 481. The supposed mortgage referred to by Mr Leib in his brief, depending upon a future contingency, is not a mortgage at all; at least, not until the happening of the contingency, and of course could not be foreclosed until it had taken effect as a conveyance. A lease which commences *in presenti* may be made to terminate upon a contingency *in futuro*, but not a conveyance.

(*b*) The practical effect of this decree is to direct the Sheriff to sell the property, described in the decree as the land purchased from Robles, and more particularly described in three deeds of record in his county; and the parties agreed that such should be the form of the direction to him. This decree is actually what the law makes it—an agreement of the parties that the Sheriff should sell the land referred to in the decree, and with greater accuracy described in those records, as much as if it had been embraced in a contract to the same

effect, signed by the parties. (*Stuart* v. *Lander*, 16 Cal. 372.)

And it was neither impossible nor inconvenient to execute this decree according to its directions. The Sheriff did execute it with the utmost exactness. If we should admit that this decree and the complaint which it followed were subject to the objections now made to them, it would be error merely, which was cured by the consent of the parties. *Consensus tollit errorem.* We think no case will be found that holds that a decree is void for defective description, when it is possible to cure the defect by reference to matters *aliunde,* whether referred to in the decree or not. The Indiana Courts, which have gone to great lengths in sustaining objections of this sort, when made on appeal from the decree, expressly disclaim the idea that the validity of the decree and sale would be effected by the error, if not cured on appeal. (5 Blackf. 143.)

The plaintiff's counsel in the Court below relied upon *Peck* v. *Mallams*, 10 New York, 532, to which we have already referred, in which the Court found that the description by which the Sheriff undertook to sell land under execution was not sufficient to identify the property intended to be sold, applying to it all the intendments applicable to the description in a deed made directly to the owner. (*Dodge* v. *Walley*, 22 Cal. 224; *White* v. *Luning*, 93 U. S. 523.

*Peck* v. *Mallams* was the only case referred to by the learned counsel in the District Court, except cases from Indiana.

In *White* v. *Hyatt*, 40 Ind. 385, relied on by plaintiff, it was held error to render a decree of foreclosure, containing a correct description, based upon evidence objected to by the defendant, when the complaint contained only a defective description. In *Struble* v. *Neighbert*, 41 Ind. 344, also cited by the counsel for plaintiff, it was held, on appeal from a judgment by default, that when the description was defective in not designating any particular piece of land, so that the Sheriff could know what to sell, the judgment was erroneous.

*Whittelsey* v. *Beall*, 5 Blackf. 143, was a suit to foreclose a mortgage. The complaint was demurred to on the ground, among others, that the description of the premises was vague

and uncertain. The Court, on appeal, held that the description was insufficient because it did not appear therefrom, upon what land the officer was to enter to execute the decree. But the Court disclaimed the doctrine, contended for here, that the decree would be void and the deed made under it inoperative.

The question involved in this dispute is not whether the decree was erroneous, but whether it was absolutely void as a decree of foreclosure. And the authorities referred to are conclusive upon the question of the validity of the mortgage. That the Court acquired jurisdiction of the subject-matter— the mortgaged premises—by the description, by which the property was mortgaged, would seem too clear for debate. And the Court having jurisdiction of the parties and the subject-matter, its decree can not be void however erroneous. The simple question is, can it be executed? That it could be executed in this case is clearly shown by the fact that it was fairly done. Jurisdiction being obtained of the person and subject-matter, no errors in its exercise, however many or gross, can make the decree void. (Freeman on Judgments, § 135; *Cloud* v. *El Dorado Co.*, 12 Cal. 128.)

The mortgage being good as a conditional conveyance, without reformation, a sale of the premises, under a decree, by which the conditional conveyance is made absolute, can not be invalid.

*Davis* v. *Cox*, 6 Ind. 481, was also a foreclosure suit. There was a misdescription in the mortgage, and the Court held, on appeal, that the decree was erroneous, without allegations in the complaint appropriate to reform the mortgage.

In *Nolte* v. *Libbert*, 34 Ind. 167, the Court held, that when a deed was referred to, for description in a mortgage, it could be shown in the suit to foreclose the mortgage, without correcting the description, that the property conveyed by the deed referred to was the same as that described in certain other deeds, if it appeared from the deed referred to; otherwise the description must be corrected upon appropriate averments. Now it is perfectly clear, that, if the Court could make a complete and perfected description in the decree upon the averments of the complaint, setting out an imperfect description, there was no want of jurisdiction of the subject-matter,

and the decree without such correction would not be void, but only erroneous.   A decree which follows a sufficient complaint must be valid, however erroneous.

In *Gayle* v. *Singleton,* 1 Stewart, 571, property in the hands of different heirs, was directed to be sold without designating what was in the hands of each.   The decree was reversed, but the bill was not dismissed.

*Miller* v. *Miller,* 16 Pick. 215, a partition suit, was before the Court on demurrer to the petition for insufficiency of description, and it was held that a reference to a deed made to the petitioner sixty years before was not sufficient, and that a description of a deed may not be sufficient in legal process.   It will be noticed in this, as in other cases, the reversal is not upon the mere fact of a reference to deeds, but the additional circumstance of uncertainty in the description referred to.

In *Lawless* v. *Barger,* 9 Bush, 665, it appeared that the decree referred, for description, to the petition asking the sale, and that the report of the Commissioner did not describe the land sold.   The sale was set aside, and a resale ordered, the Court holding that the decree should contain a complete description without reference to the complaint.   This, however, was in a case where the decree and report of sale were recorded for the protection of purchasers.   That is not the rule as to other actions.   (*Kelly* v. *McKibben, supra.*)

The learned counsel has cited several tax cases in this State, to which we do not think it necessary to refer, as those cases stand upon a different footing, and the Court will indulge in no intendments, nor can any reference be made, *aliunde,* to aid the description in the assessments which are to be made in a particular manner.

These, like the other cases cited, came up on a direct attack upon the judgment.

In all the cases referred to by the learned counsel for the respondent, the question arose upon demurrer, or a direct appeal from the judgment, and in no case was it intimated that the Court had no jurisdiction of the subject-matter; but when the complaint was demurred to, an amendment was allowed.   It must follow that the Court had jurisdiction of the subject-matter, so that the decree was not void, but, at

most, only erroneous. That the property was mortgaged is fully sustained by the authorities above cited. It is clear, then, that the land sold was conveyed by the mortgage.

And we respectfully submit that a description which is sufficient in a deed *inter partes* is sufficient in a decree based upon that deed, especially when the decree is agreed to by the parties. Suppose this, instead of a mortgage, had been a deed of trust from Crosby to secure the payment of this note, and had provided that the trustee should sell the property at public auction, in satisfaction of the debt; and that the trustee had proceeded to sell the property by the same description as contained in the trust deed, we submit that the conveyance would be as good, made by the trustee, as it was when made to him by the grantor of the trust. The same rule of construction must govern the deed from the trustee, as the deed to him. And the parties have an undoubted right to make such a contract.

Suppose, again, Crosby had made a contract with Overfeldt to convey the premises, describing them as in this mortgage, and a bill had been filed to compel the conveyance, and the decree had simply ordered him to convey the premises by the same description, would the decree have been void? If so, the deed made under it would be void, and we would have the case of a man making a deed, by order of the Court, void, when the same deed made without such order would have been perfectly good. And we submit that if the party failed to execute the deed according to the mandate of the decree, it would be perfectly competent for the Court to direct a commissioner to execute it for him.

Whatever one may and ought to do voluntarily, he may be required to do by the Court. And whatever he may do himself, he may do by his constituted agent, whether appointed by himself, or by the Court, or by law.

If the Sheriff had sold the property by the same description contained in the decree, the sale would have been as valid as if made by a trustee of Crosby, or by a Commissioner appointed by the Court, or by Crosby himself under the directions of a decree. As the Court holds in *Whiting* v. *Buckman*, the indefiniteness of the description does not affect the validity of the decree, but after a sale the question

properly arises, is the description sufficient to enable the purchaser to identify the land? And we submit that a purchaser at Sheriff's sale can identify the land as easily as if he had purchased directly from the mortgagor.

In this case, Crosby made a valid, conditional conveyance, and after breach of condition, contracted that the property so conditionally conveyed should be absolutely conveyed by the Sheriff. He had a right so to contract. We say he so contracted because a judgment made after obtaining jurisdiction of the parties is a contract of the highest character, and it was made upon the express agreement of the parties.

Suppose this mortgage had been made before the law required a sale on foreclosure, and the mortgagee had entered for condition broken; could not the mortgagor have maintained his bill to redeem, without giving any other description than that contained in the mortgage? And if a decree were made directing the mortgagee to reconvey the property by the same description, on receiving his debt, would not such a decree be perfectly valid, and the property revest under the deed made in pursuance of it? And in case the mortgagee refused to make the deed, we submit the Court could direct its Commissioner to make it, and when made, it would be effective to revest the title in the mortgagor.

But in all cases, when the Court is called upon to aid a party in the enforcement of his rights by a sale, it will, at the instance of the opposite party, see to it that the sale is so made that it will be fair to both parties; and if the description needs explanation for that purpose, it will require it to be made. And so in this case, if Crosby had objected to this decree because it did not set out the particular description in the deed referred to, instead of consenting to it, we readily concede that the Court would have directed explicitly that the Sheriff, in selling, should do what he did, and was authorized to do by this decree—give a full description in his notice of sale.

We submit that, the Court having jurisdiction of the parties and the subject-matter, the decree made by it was not void; and that it having been entered, "by stipulation and agreement of the parties," was not even erroneous.

We respectfully submit that all the cases hold, that by the

description in the complaint in *Overfeldt* v. *Crosby*, the Court acquired jurisdiction of the land mortgaged and sold; and that whatever errors or defects may appear upon the face of the record, they do not affect the validity of the judgment or sale made under it.

II. If a cause of action ever existed in favor of the plaintiff, it was barred before the commencement in this action. (C. C. P., § 322.)

1. Section 328 of the Code provides, that if, at the time the title of the plaintiff descends or accrues, he is a minor, the time during which the disability exists shall not be counted as a portion of the time limited for the commencement of his action.

Section 357 provides that no person can avail himself of a disability, unless it existed when his right of action accrued. Until the adoption of the Code (January 1, 1873), the administrator alone could maintain the action, as trustee of the heirs and creditors.

Section 1452 of the Code, while it still gives the administrator the exclusive right to the possession until distribution, provides that the heir may join with the administrator, or maintain an action in his own name, to recover the possession. Now it is clear, that whatever 'action the heir may maintain, so far as it relates to the possession, it must be based upon the right of the administrator. The heir has no more right to the present possession than has a creditor. This provision created no right in the heir, nor did any title or cause of action accrue to him thereby. Whatever right the heir has (which does not include present possession), descended to him at the death of his ancestor. (*Brenham* v. *Story*, 39 Cal. 188.)

If the heir could maintain an action of ejectment, it would be upon the right of present possession in the administrator. If the heir had been given the present right of possession by the Code, it would not have been provided that he could join with the administrator in the suit. By providing that he might join the administrator in the suit, it is clear that it was not intended to give him any new right, but to allow him, with the proper averments as to his beneficial estate and right of possession at the termination of the right of possession in the administrator, to maintain an action to recover the pos-

session for the administrator, and so protect his contingent right. The right of action is the same, or the heir could not join with the administrator in prosecuting it.

The heir can join with the administrator in a pending suit, but his joining in it does not change the cause of action. And the pendency of such an action, we submit, could be successfully pleaded in abatement of one commenced by the heir.

The statute bars the action in favor of the heir, if allowed to run its course against the administrator.

We respectfully call the attention of the Court to the very able and exhaustive opinion of Judge Sawyer, of the United States Circuit Court, 3 Sawyer's Rep. 211, *Meeks* v. *Vassault; Tynan* v. *Walker,* 35 Cal. 634; *Curtis* v. *Sutter,* 15 id. 260; *Meeks* v. *Hahn,* 20 id. 620; *Chapman* v. *Hollister,* 42 id. 462; *Cunningham* v. *Ashley,* 45 id. 485.

When the trustee is barred, the *cestui que trust* is also barred. (Hill on Trustees, marg. pp. 267, 403, and 504.) That the administrator is the trustee of the heir is established by a series of cases, commencing with *Beckett* v. *Selover,* 7 Cal. 239. (*Meeks* v. *Vassault, supra.*)

It would be difficult to give any reason why the Statute of Limitations, having run its course against the administrator, should not bar the heir as well as a judgment against the administrator. Each is based upon the idea that the cause of action is the same.

This Court directly decided in *Cnnningham* v. *Ashley, supra,* that a judgment against the administrator bars the heir. This could not be unless the cause of action in favor of the heir was identical with that in favor of the administrator. The plaintiff therefore acquired no new right by the Code giving her the right to maintain an action in her own name. And she was barred when the statute had barred the administrator, on the nineteenth of February, 1873, five years from the issuance of the patent.

We respectfully submit that the infancy of the plaintiff can not in the remotest degree affect the defense of the Statute of Limitations. If, by the adoption of the Code, which took effect January 1, 1873, a new cause of action was given to the heir, the statute clearly had not barred the action based upon this new cause, and this without reference to the minority of

the heir. If, on the other hand, the operation of the Code was to let the heir into a subsisting cause of action already existing in favor of her trustee, the administrator, then the statute having commenced its course, continued as against the heir, notwithstanding her infancy.

We submit that whatever the form of the action which is permitted to be maintained by the heir to recover the possession, it must be based upon the right of the administrator to the possession, and it can not possibly be founded upon a new and independent cause of action arising to the heir.

In any event the plaintiff, at most, had but one month and nineteen days, after attaining her majority, to commence her action, for this was all the time that remained to the administrator on January 1, 1873, the patent having issued February 19, 1868. Her action was commenced one month and twenty-five days after attaining her majority, she being eighteen years of age on February 26, 1877.

Section 9 of the Code is to the effect that, "if the statute has begun to run when the Act takes effect, the time already run shall be reckoned as a part of the time limited by the Code."

The statute had begun to run against Crosby's administrator (the only party then entitled to bring this action) on the nineteenth of February, 1868; and therefore, on the first of January, 1873, when the Code took effect, there remained but one month and nineteen days before the statute would have barred the claim.

Section 1452 of the Code says: "The heirs may themselves, or jointly with the administrator, maintain an action for the possession of land." The question is, can this section of the Code be fairly construed so as to give to the heir, suing alone, the right to maintain an action which, if brought by the administrator alone, would be barred by the statute?

If the Act had simply given to the heir the right to sue alone, the implied addition contended for, viz., "notwithstanding the cause of action would be barred, as against the administrator," might not seem so absurd. But when the Act says, in effect, "the heir alone, or the administrator and heir jointly, may maintain an action," the implication we contend for, viz., "unless the action is already barred as against the adminis-

trator," seems obvious. For surely it would be stultifying the Legislature to make them say, "An administrator may hereafter maintain an action for the recovery of the land, although such action would otherwise be barred by the Statute of Limitations, provided he join the heir as plaintiff in such action." And it will be observed that the heir can not maintain an action in which the administrator may not join, for it is the administrator's right of possession that is to be tried in the action.

There is certainly nothing in the Act to indicate that it was the intention to take away the bar of the statute in one case (that of the heir suing alone) and not in the other (that of the administrator and heir suing jointly), and no reason whatever could be given for allowing the administrator to get rid of the bar of the statute by the simple expedient of joining the heir as plaintiff. But, indeed, there is nothing in the Act showing any intent to touch the Statute of Limitations. The object was to give the heir the right to sue when the administrator could sue alone, but would not—the right to maintain an action which the administrator ought to maintain. And we submit that, when the heir brings a suit to recover the possession, unless the administrator joins as plaintiff, he must be joined as defendant, as he is a party interested. For, if there is a recovery, it is his possession that is recovered, and he is entitled to the rents and profits, as well as the possession, for the benefit of creditors as well as the heirs and legatees.

2. The plaintiff and her mother were equal owners in common of whatever right descended at the death of S. J. Crosby. Now, as has already been shown, the right of action of the mother, whatever it was, must have been barred February 19, 1873.

And, even if the plaintiff's right of action was preserved by reason of her minority, conceding that she had acquired and then had an undivided half of all the rights of her father in the land, subject to administration, she and the defendant Clarke, on February 19, 1877, forty days before the commencement of this action, became tenants in common *quoad* the title of the plaintiff. (*Williams* v. *Sutton,* 43 Cal. 73.)

It is claimed, however, that the transcript does not show that Clarke has ever held adverse possession of the premises as against the plaintiff's co-tenant.

We respectfully submit that the findings show conclusively that Clarke held the whole premises adversely to everybody from his entry under the deed from Overfeldt. Finding 18 finds that, at the date of his deed from Overfeldt, May 22, 1861, Clarke took possession of the premises in controversy except eighty acres held by Dowd as a tenant of McGarahan; and that March 27, 1866, Dowd took a lease of two hundred and forty acres of the land, including the eighty acres, and entered under the lease, and has ever since occupied this two hundred and forty acres as the tenant of Clarke. And that continuously since March 26, 1866, the whole of the disputed premises had been held and occupied by Clarke or tenants holding under him.

The testimony upon which these findings were made is not set out, but it appears that Clarke had leased the land from the administrator, for a period having reference to the period when he would be entitled to possession under his purchase from Overfeldt, except the eighty acres which were held adversely by McGarahan. So that when he took the deed from Overfeldt he ceased to hold any longer in subordination to the administrator representing Mrs. Crosby, as heir, and the creditors, and made a new entry under his deed. The entry under the deed was adverse to the heirs and representatives of the estate of Crosby. And that hostile attitude continued up to the trial of this action.

The proceedings leading to the sale, the sale itself, and the deed of the demanded premises, and the entry and holding under it, were all necessarily hostile to all persons claiming as representatives or successors of Crosby, the mortgagor. The facts as recited in the opinion in *Simson* v. *Eckstien*, 22 Cal. 589, are substantially the same as those here found in which the Court (Id. 565) holds the entry and holding adverse.

It is claimed also by respondent's counsel that the finding, to the effect that Clarke claims to hold the same under and by virtue of said deed from Overfeldt, and upon or under no

other claim whatever, does not find an adverse holding at any period prior to the trial.

We submit that the connection, in which it is found, shows that it was intended to cover the whole period since his entry under the deed. The finding that he claims under that deed would have no meaning or purpose unless it had reference to his entry under it. And it will not be presumed that the Court took the trouble to find a fact having no reference to the case. But if it should be held as claimed by the respondent's counsel, it would make this finding nugatory and leave no finding upon the issue of the Statute of Limitations, and the judgment would be reversed for this defect. (*Shaw* v. *Wandesforde*, decided by this Court Dec. 2, 1878, 2 P. C. L. J., 282.) But we submit that independent of this part of the finding, the adverse entry and holding are sufficiently found.

This finding was necessarily based upon the documentary evidence and the fact of entry under the deed from Overfeldt. And we submit that all the evidence necessary to establish adverse possession under a deed, purporting to convey the premises, are the facts of the delivery of the deed, and entry and occupation under it. These facts being proven, it would require some evidence from the other side to show that the holding was not as the taking of the deed, the entry and holding under it indicated. If the ultimate fact is not clearly found, it is a defect in the findings for which the judgment must be reversed.

It is contended that the finding of title in plaintiff is the ultimate fact, and is a finding against the Statute of Limitations. And although the learned counsel who argued this cause for the respondent did not agree to this point, as the counsel who made it filed a brief at the last argument in which he seems to renew it, we have thought proper to answer it by the authorities heretofore referred to in our brief.

In *Marshal* v. *Shafter*, a judgment in ejectment was pleaded in bar of the action, and the question was, whether a judgment based upon special findings upon which the District Court decided or found as a conclusion of law that the plaintiff in the case, pleaded in bar, had no title, but upon which, on appeal, the Supreme Court decided that the plaintiff had title, and reversed the judgment of the District Court and

ordered judgment for plaintiff. When the record in this case came to be considered as *res adjudicata*, it was determined that it did conclusively decide the question of title; and that it made no difference whether that finding was ranked among the findings of fact or law.

This Court did not, however, hold that it was an ultimate fact which controlled the special findings, otherwise a new trial must have been ordered, for the Supreme Court could never find facts, but only decide what, as a matter of law, resulted from the special facts found. In *French v. Edwards*, 21 Wall. 147, the Circuit Court had found facts from which the Supreme Court determined, as matter of law, that the plaintiff had title, and remanded the cause for further proceedings in accordance with that opinion. But the Supreme Court also held that that was not a finding upon the Statute of Limitations, which had been pleaded.

*Ex parte French*, 91 U. S. 423, holds that the issue of the Statute of Limitations was an issue upon which there must be a special finding.

III. The judgment is clearly erroneous, in that it adjudges that the plaintiff is the owner and entitled to the possession of the whole of the disputed property, when, admitting that the plaintiff was entitled to the possession, she is the owner of only one undivided half. This is material even if the plaintiff were entitled to the possession of the whole as tenant in common, for it is conclusive in an action for mesne profits. (2 Greenl. on Ev., § 332, and note; *Mahoney* v. *Middleton*, 41 Cal. 41.)

*S. F. Lieb* and *McAllister & Bergin*, for Respondent.

I. The Statute of Limitations could not run against plaintiff, she being an infant, and bringing suit immediately on her coming of age. There is no finding or proof of adverse possession, and the finding of title in plaintiff is of course a finding that there had been no five years adverse possession, if such adverse possession would give them title under the circumstances of the case. But had there been a finding the other way, it would still avail them nothing, because:

1. Plaintiff was an infant until within a few months before

bringing suit.   It is clear that she was not barred.   (*Burton* v. *Robinson*, 51 Cal. 186.)

2. It makes no difference whether there was an administrator or not.   We are in a position precisely analogous to a remainder-man.   A remainder-man is precisely what we are, the tenant for years being the administrator, with the right to the possession of the land until the close of the administration.   We had the legal title from the moment of S. J. Crosby's death, but without the present right of possession. We took no title from the administrator.   He had simply a lien on the land for the payment of the debts.   (*Beckett* v. *Selover*, 7 Cal. 238; *Estate of Woodworth*, 31 id. 604; *Burton* v. *Lies*, 21 id. 91; *Chapman* v. *Hollister*, 42 id. 462; *Brenham* v. *Story*, 39 id. 179.)

A remainder-man is never barred until he has the right to possession.   An adverse possession can only be against a person entitled to possession.   (*Clarke* v. *Hughes*, 13 Barb. 152; *Wells* v. *Prince*, 9 Mass. 508; *Wallingford* v. *Hearl*, 15 id. 471; *Tilson* v. *Thompson*, 10 Pick. 362; *Miller* v. *Ewing*, 6 Cush. 34; Angell on Limitations, 364–378, and cases cited [and see C. C. P., in connection with Angell, 369]; *Jackson* v. *Schoonmaker*, 4 Johns. 390–402; *Jackson* v. *Sellick*, 8 id. 269; *Jackson* v. *Johnson*, 15 Am. Dec. 433, 449, and note; *Jackson* v. *Mancius*, 2 Wend. 360; *Forgal* v. *Pirro*, 10 Bosw. 113; Washburn, Real Property, 3d. ed., 113, 132, 303; Washburn on Easements, 114; Tyler on Ejectment, 923; *Woodson* v. *Smith*, 1 Head, (Tenn.) 276; *Higgins* v. *Crosby*, 40 Ill. 260; *Foster* v. *Marshall*, 22 N. H. 491; *Pinckney* v. *Burrage*, 31 N. J. L. 21; *Blair* v. *Bland*, 3 Munford, (Va.) 570.)

3. *Tynan* v. *Walker* in no way militates against these views, but is directly for us.   That case was decided on the fact that under our system an administrator in contemplation of law is *in esse*, and entitled to the possession from the date of the death, and therefore the statute ran against him from that time.   (*Jahns* v. *Nolting*, 29 Cal. 510–11; *Ham* v. *Cunningham*, 50 id. 364.)   But suppose there had been an infant heir who had brought suit, instead of having an administrator appointed, as might have been done.   (*Updegraff* v. *Trask*, 18 Cal. 458; *Hart* v. *Robertson*, 21 id. 348; *Chapman* v. *Hollister*, 42 id. 463–64.)

They must admit that in that case, for it is self-evident that the infant could not have been barred. How, then, could the mere appointment of an administrator bar the infant? This shows conclusively, that under the decisions the statute never runs against the heir, after an administration begins; and this on the simple ground that after that time, the heir has no right of action until the administration closes.

4. Nor does *Cunningham* v. *Ashley,* 45 Cal. 485, in any way militate against us. That case was expressly put on the ground that the statute expressly allowed and required the administrator to call to his aid and use the heirs' title in an ejectment, and that, therefore, the action should be conclusive on the title which was thus put into actual controversy. But the statute neither expressly nor impliedly says that the heir's title shall be affected when the administrator has in no way anything to do with such title, and does not use it or meddle with it at all. No one doubts that a guardian may bring an action for an infant, and in case he does so, that the infant will be barred, but if he fails to do so, the infant can not be said to be barred. So when an administrator brings or fails to bring an action.

5. But opposing counsel seek to draw comfort from the case of *Meeks* v. *Vassault,* 3 Sawyer, C. C. 206, and Judge Miller's opinion, in the same case, on appeal to the United States Supreme Court, 5 Pac. Coast Law Journal, 391. That case, however is entirely inapplicable to the case at bar, and even if it were not, it is a manifest misconstruction of our statute; and that, too, for many valid reasons, to which we now call the Court's attention.

In the first place, the Federal Courts deal more particularly with Federal Laws. It is not to be expected that they have that familiarity with the local laws of thirty-eight States which the Supreme Courts of those States have. This is strongly illustrated in this case, where both Judge Sawyer and Judge Miller state that the heir has a remedy against the administrator for the loss of the title to the land, when it is a fact that there is not and never was a statute in this State providing that the administrator should give a bond for the value of the land, but only for the value of one year's rents and profits, and yet upon this false assumption they substantially build their whole argument.

Hence the United States Supreme Court has always grace-fully changed its decision construing the statutes of the State, when it had theretofore misapprehended the true meaning of such statute and had in the meantime been "set right" by the decision of the Supreme Court of the State. And their reports will show that the cases in which this has happened are by no means infrequent, and in no class of cases has it been more frequent than in the Statutes of Limitations. On the other hand, when a Supreme Court of a State has misap-prehended and misconstrued a Federal statute, the United States Supreme Court never hesitates to set it right.

(1.) That case is inapplicable because there does not seem to have been any question of infancy involved or discussed. Indeed what is said in 3 Sawyer, 315, is entirely inconsistent with any question of infancy—for if an heir is to compel an administrator to sue or obtain a distribution, he could not be considered in default for not doing so while he was an infant.

(2.) Because the sections of our statute therein involved had nothing to do with adverse possession at all, but the time was to commence to run from a date, just the same as a promis-sory note. Great stress was laid upon this point by both Judge Sawyer (p. 216) and by Judge Miller (p. 394). Our Probate Act which was construed to read as follows:

"SEC. 190. No action for the recovery of any estate sold by an executor or administrator, under the provisions of this chapter, shall be maintained by any heir or other person claiming under the deceased testator or intestate unless it be commenced within three years next after the sale."

"SEC. 191. The preceding sections shall not apply to minors or others under any legal disability to sue at the time when the right of action shall first accrue; but all such persons may commence such action at any time within three years after the removal of the disability."

It will be observed that if the sale·is to be attacked at all, it must be done within three years after the sale, without reference to any adverse possession whatever. It runs as the time would on a promissory note, so long from a certain date, irrespective of when adverse possession commenced. What was said by either of the judges must therefore be limited to the facts in that case.

(3.) But if anything that was said by either of those Judges was intended to apply to the general Statute of Limitations, there was evidently a misapprehension in their minds as to the intent, and the true construction of such statute. We hope we will clearly make this appear from what follows.

(4.) Several authorities are cited by both Judge Sawyer and Judge Miller to the effect that where a trustee is barred, his *cestui que trust* is barred with him. This is true, because the law which deals with actions of ejectment does not recognize there being such a thing as an equitable title. When the legal title is gone (which is all the Court of law knows anything about), that of course is the end of it. Nor is the matter helped by the trustee thereafter conveying the legal title to the *cestui que trust.* The legal title being gone, it makes no difference whether the trustee conveys to the *cestui que trust* or to a stranger. In either case (the legal title being alone recognized), the grantee, whether he be *cestui que trust* or stranger, can acquire from his grantor no right of action which the grantor himself did not have. And this as we have said, results from the fact that the law recognizes but one estate and that the legal estate. Whenever that estate is vested in a party who has the present right of possession, the adverse possession will run against it. And it will be noticed that every single case cited to this proposition was a case where the trustee held the legal title. It was such cases of trust with which those authorities dealt, one and all.

Now is an administrator under our law such an trustee as that? Does he hold the legal title or does the heir hold it? This we will endeavor to answer.

(5.) In *Beckett* v. *Selover,* 7 Cal. 238–239, it was held that the administrator had no title whatever. The heir was held to have the whole estate both legal and equitable, subject only "to the lien of the administrator for the payment of debts and the expenses of the administration, and with the right of the administrator of present possession." "The lien he must enforce by the judgment of the Court." The learned Judge then goes on to prove that the administrator has no title whatever; that he has simply a lien, and a lien only, and that the heir is the full owner, just the same as any other

owner, and that the lien the administrator has, is simply that which every creditor has. He says:

"If the title of the property of the intestate vested in the administrator it would be necessary for him, in case of real estate, to execute conveyances to the heirs after final settlement. And it is no objection to this view that under these probate sales, where properly conducted, the title of the purchaser comes from the ancestor, and not from the heir; the lien of the administrator is created by the act of the ancestor in creating the debt, and is paramount to the right of the heir. The heir takes by descent, the administrator gets his lien by virtue of prior contract. This contingent lien every man creates when he contracts a debt, and upon his death the lien attaches to all his property. The administrator is more the representative of the creditors than the heirs. In all suits for the benefit of the estate he represents both the creditors and the heirs; and in proceedings to sell property, he is not the sole representative of the heirs, but the moving party on behalf of the creditors." (2 Comst. 462.)

The case in Comstock's Reports is simply to the proposition that the administrator represents the creditors, and this seems to be the whole burden of the learned Judge's argument. And yet from this language it is sought to draw a conclusion that the administrator is the trustee of the heirs.

The whole policy of our statute is in accord with the idea above expressed—that the administrator is the representative of the creditors; that he is appointed to pay the debts; that possession is given him to aid him to accomplish that end, and that as soon as that end is accomplished, he is to step down and out, and let the heirs enter upon their title, which right of entry thereon up to this time is denied them. But as to being barred of their legal estate, because the administrator was a trustee, you might as well say that the heir's title was barred if a creditor had himself been entitled to possession until his debt was paid, on the ground that the creditor was the trustee for the heir.

Suppose the statute should say that a creditor should have possession of his debtor's land until his debt was paid; would that make him a trustee of the heir? In *Janes* v. *Throckmorton*, 57 Cal. 368, the question was where an intestate

died owning an equitable title. His heirs at law sued the
trustees for the legal title. It was objected that the admin-
istrator was entitled to the legal title. This was probably as
fair a test as to who takes the legal title, as could be possibly
imagined. It was held that the trustees should convey the
legal title to the heirs and not to the administrator. The
Court say:

"Are·plaintiffs (the heirs) the proper parties to bring this
action? On the part of the defendant (the trustee) it is ar-
gued that the administrator of the estate of Janes alone can
bring it.  *  *  *  In *Chapman* v. *Hollister*, 42 Cal. 463, it
is said: On the death of the ancestor his title to real estate
passes to the heir or devisee, subject, however, to the right of
possession of the executor or administrator for the payment
of debts. (Probate Act, §§ 114, 194; *Beckett* v. *Selover*, 7
Cal. 215; *Meeks* v. *Hahn*, 20 id. 627; *Matter of Estate of
Woodworth*, 31 id. 604.)  *  *  *  The present action is
brought to establish a trust and to compel defendant to con-
vey the legal title to real estate to the plaintiffs as heirs at
law of Janes. On his death his title, then an equity, passed
to the heirs, as was held in the cases last cited."

The Court held that the heirs were entitled to both legal
and equitable title. So in *Brenham* v. *Story*, 39 Cal. 188,
which was the case where the Legislature attempted to au-
thorize the administrator to sell, not for the payment of
debts, but for the heir's own good. In other words, the stat-
ute sought to make the administrator a trustee for the heir.
But the Court said no. The administrator was there simply
and solely to pay debts, and not to operate for the heir; that
the heir was the full owner of the property, and could not
have the administrator forced upon him as his trustee.

(6.) We then see that the administrator is the trustee of no
title whatever, either legal or equitable. That he, having
been given—to quote from the cases just referred to—"the
right of possession for the payment of debts," would be
bound by a proper regard for the rights of the heir to take
good care of the property, to commit no waste thereon, is no
doubt true. The law casts on him precisely the same duties
in that regard, that it casts upon the one in possession in
favor of the remainder-man. But we all admit that a

remainder-man would not be barred by an adverse holding of a third party.

(7.) Suppose the statute provided that the administrator should immediately on his appointment, sell to the highest bidder the right to the exclusive possession of the land during administration, and apply the proceeds to the payment of debts. Would it be denied that upon that sale being made, the heir would then be a remainder-man? And would not the law cast upon the purchaser the same obligations to take good care of the estate that it does on the administrator? Would one be more of a trustee of the heir than the other? And if the heir is a remainder-man in one case, why is he not in the other?

(8.) But the learned Judge of the Circuit Court says that the trespasser may not be able to get a title for a century by wrongly enjoying some one else's property. So he might not in cases of remainder. But the statute originally contemplated but one year to elapse before administration was ceased. And when it was found this expectation was disappointed, the statute was amended so as to give the heir the right of possession and set the Statute of Limitations to running against him. This was eight years ago, and three years ago the last adult heir in the State was barred when there had been an adverse holding and the heir had not commenced his action within the five years given him.

(9.) But says both Judge Sawyer and Judge Miller, the heir has a remedy. He may sue the administrator (on his bond of course). But the trouble is, there is no bond provided for by our statute except for twice the "value of the personal property and twice the probable value of the annual rents, profits, and issues of the real property." (Probate Act, 73, C. C. P. 1388.) No bond whatever as to the value of the real property. Why? Because the statute does not contemplate that the title thereto can be taken away from the heir, by any act of the administrator. And this view is strengthened by the statute forbidding a sale of real estate until an additional bond is furnished by the administrator for twice the probable amount that will be realized at the sale. Even if it were otherwise, what protection would there be? Take this case at bar. The patent issued in 1868. There was then a

nominal administrator who never did anything, and who was discharged within the three years thereafter. Now he could not be made even personably responsible, for until five years had fully run there could be no title lost—and he was administrator but three years, so he did not lose it.

(10). But it is said, the heir might have compelled the administrator to have brought suit. That would be a novel doctrine. The authorities Judge Sawyer cited to that proposition do not bear him out in such a case as this. As to the rents and profits the administrator could answer to the heir, that he had given bond for that, and it was none of his business whether he was in possession or not so far as the rents and profits were concerned. As to losing the title he could answer that there was no hurry, he could sue the last day if necessary and prevent the running of the statute. Even if the heir could sue the administrator to compel him to sue the trespasser, yet if the heir was a minor, he would have until after he was of age to compel· the administrator to bring the suit.

(11) So it is said, the heir might have had the distribution made. But how could it be expected that an infant heir should do so. If this plaintiff was barred at all she was barred before she was thirteen years old.

(12) It is difficult to see how an administrator is any more a trustee for the heir than a guardian is for his ward. Both may sue a trespasser. And in case of litigation, the minor must appear through his guardian just as the heir must through the administrator. The litigation is equally binding on each. But the guardian does not own the title; neither does the administrator. The minor is not barred if the guardian fails to sue, neither is the heir. Indeed the guardian is specially appointed to take care of the minor, the administrator is appointed for the creditors, and if he represents the heirs at all, to any extent or in any degree, it is only incidentally, and as a matter of good faith which the law imposes upon him.

(13) If the administrator had become involved in litigation he had a right to use our title (not to own it.) He never has owned it. We have no title which he ever owned. We never received any title from him whatever. If so, when, where, and how? If then we are not suing on any title which the

administrator ever had, how did the administrator ever lose it? How can a man lose that which he has not got? If we had to trace our title through the administrator, then if he was barred while he had the title we of course would be barred with him. But the administrator does not appear in our claim of title at all.

(14) This disposes of about all the suggestions given by either Judge Sawyer or Judge Miller. But there are other reasons why the plaintiff cannot be said to have lost her title by the Statute of Limitations, and those we will notice before we leave this subject.

6. Let us apply the rule for which they contend, to this case. Let us name the time when plaintiff was only twelve years old, from February 26, 1871, to February 26, 1872; there was then no administrator. She owned the patent title. That title was not yet five years old; the defendant was in possession. And yet she could not sue. Why? Because our statute (as construed by *Chapman* v. *Hollister*, 42 Cal. 463, and cases therein cited) absolutely prohibited her from suing, because the administration had not been closed. But while the statute prohibited her from suing upon her title, it did not intend to compel her to lose her title by the adverse possession of some trespasser. It was not to enable trespassers to acquire title that that statute prohibited her from suing on her title while administration was unclosed. The statute speaks without any uncertain note on this point. Statute of 1850, page 346, Section 27 (C. C. P., § 356), reads as follows: "When the commencement of an action is stayed by  *  *  *  statutory prohibition, the time of the continuance of the  *  *  *  prohibition is not part of the time limited for the commencement of the action." This very section was construed by the present Supreme Court in *Hoff* v. *Funkenstein*, 54 Cal. 235. And it was then held that while the party might have succeeded in having an action instituted, yet that the evident theory of our Statute of Limitations was that the party should have the full time "on any day of which he may, of his own volition, commence an action."

7. Upon the close of administration, says the statute (Probate Act, 289; C. C. P., § 1666), the heir or devisee has a right to enter upon the land and take possession thereof, and if

necessary to "sue for and recover" the same from "any person having the same in possession." The title he has had ever since the death of his ancestor, but the right of entry upon that title has just now accrued, and having now accrued he should have a reasonable time to enforce it. And the statute says he shall have five years after his right to make entry (that is, to take possession) accrues to him.

C. C. Pro., § 320: "No entry upon real estate is deemed sufficient or valid as a claim, unless an action be commenced thereupon within   *   *   *   five years from the time when the right to make it   *   *   *   accrued."

Indeed the test of when a man is barred is always determined by the question as to when his right of entry accrued.

"Therefore, to determine whether or not the party is barred of his right to maintain an action of ejectment, it is requisite to determine when his right of entry accrued." (Angell on Lim. 374, § 369.)

8. Indeed a statute which allowed a person's property to be taken away from him by the adverse possession of a trespasser without giving him a right to sue, would certainly be depriving him of his property without due process of law, and would be unconstitutional. Nor can it be said that the wrong is cured by giving some stranger (whom it terms by name, administrator) the privilege of suing, since such stranger is required to give the owner no bond that he will sue; there is no administrator's bond for the value of the land; simply for the value of the rents and profits for one year, and the personal property. To quote from Judge Cooley (Const. Lim. 365):

" Every Government is bound in good faith to furnish its citizens all needful legal remedies," and while "it is not bound to keep its Courts open indefinitely for one who neglects or refuses to apply for redress," yet " all limitation laws must proceed upon the idea that the party by lapse of time and omissions on his part, has forfeited his right to assert his title in the law."

And again on page 366: "All Statutes of Limitations, also, must proceed upon the idea that the party has had a right to try his right in the Courts."

9. If the statute had always allowed an heir to sue, then

confessedly the plaintiff would not have been barred, for she has always been a minor. What kind of logic is this, then: that if the Courts were not open to her, she is barred, but if they were open to her she is not barred. Does not this seem not only inconsistent with the constitutional sentiments of Judge Cooley above expressed, but inconsistent with all common sense?

10. If this plaintiff was barred when the patent was five years old it is through no fault of hers. She was but a mere child, and even if an adult she could not sue, for the administration was unclosed. But the statute is certainly not so brutal as to divest an infant of her estate without some remedy for the loss. If she has a remedy, would the Court please point it out, that she may yet avail herself of it? Shall she sue on the administrator's bond? Alas! there is no bond for the real estate, for none was ever required by the statute. Shall she sue the administrator on his individual responsibility? Which one shall she sue? If she sues Reed he will say he only held the administration a year or so and resigned long before the patent issued. Shall she sue Beach? He will answer that he resigned and was discharged before the patent was three years old, and that the title was still perfect and unaffected when he was discharged. Shall she sue Smith, the present administrator? He will answer he was not appointed until three years after the title was lost, if it had been lost at all. Where is the remedy of the administrator's responsibility which Judge Sawyer and Judge Miller assume to have been provided for by our statute, without ever having taken the trouble to read the statute to see.

If the law is to be so construed that an infant is to be held barred under such circumstances, then we must admit that children, mere infants, can, by the provisions of this wise (?) and humane (?) law, be divested of their estates, without their knowledge, without their fault, without compensation and without remedy. Laws are to be construed in accordance with the intention of the legislators passing them. If this law is to be thus construed it must be upon the ground that such was the intention of the legislators. In that case it is a wonder that when voting "aye" their tongues did not blister, and their lips parch, and the word stick in their throats. Must

the law be thus construed? Is it not susceptible of receiving a more humane construction? Natural right would certainly demand it.

"When a statute  *  *  *  is equally susceptible of two interpretations, one in favor of natural right and the other against it, the former is to be adopted." (C. C. P., § 1866.) "It would seem that this view (that the act or negligence of the administrator should not bind the heir) is supported by every principle of justice. It must be conceded that the negligence, favoritism, and fraud of administrators should be carefully watched. The administrator has no interest in preserving the estate for the heir." (*Beckett* v. *Selover,* 7 Cal. 241.)

And yet this is the case that is relied upon to establish that an administrator is the trustee of the heir, and that therefore his negligence binds the heir.

11. But there are three complete answers to the whole proposition irrespective of any of the propositions established hereinbefore. They will be stated separately.

12. On the first of January, 1873, the patent title had not been barred against any one—for it was not then five years old. On that day the Code went into effect, giving us for the first time the statutory right of ejectment—the statute then began to run against us. This clause was inserted in the Code for the express purpose of setting the statute in motion against the heir, even before the close of the administration. No other reason can be suggested. Immediately upon that Act going into effect, every heir was required to bring his action within the statutory time, or be barred. The converse of this is also true. The statute being set in motion against us individually, for the first time, we had the statutory time within which to bring this action. This we did, and therefore there is no bar.

Wherever the Statute of Limitations is brought to bear upon a right of action, (as it was when we were given the right to sue; of course the statute would begin to run against us then), the party has the full time mentioned in the Statute of Limitations in which to bring suit. (*Lewis* v. *Lewis,* 7 How. 776; *Sohn* v. *Waterson,* 17 Wall. 596.)

13. As we have just said, when the Codes went into effect, the patent was not yet five years old, and no one was barred.

At that time, even defendant does not claim he had any title by adverse possession. At that time, therefore, it was fully within the power of the Legislature to repeal the Statute of Limitations then existing. In Title 2, Part 2, of the Code of Civil Procedure which deals with the Statute of Limitations, we find a section reading as follows: "Sec. 362. This title does not extend to actions already commenced nor to cases where the time prescribed in any existing statute for acquiring a right or barring a remedy has fully run; but the laws now in force are applicable to such actions and cases; and are repealed subject to the provisions of this section."

It will be observed that the old Statute of Limitations is still kept in force for two classes of cases (in neither of which does the present one fall) viz: First; To cases where an action was actually pending. Second, To cases where the statute had completely run.

With those two exceptions, and subject to those two exceptions, the old statute is absolutely repealed. It is, as to every other case, swept absolutely out of existence; it is as to the non-excepted cases as if it never was. By the very terms of that section, it was, except as to the cases provided for in that section, swept out of existence. No rights of adverse possession depending upon it were saved, except those expressly mentioned. If any other section can be found seemingly inconsistent with this one, yet this one, being in the very title dealing with the Statute of Limitations, is to govern and control. (Political Code, § 4481.)

Nor was the title patent barred when the Civil Code went into effect, and that Code also saves our rights, even assuming the administrator has an estate in the land. This will readily be seen by quoting a few sections from that Code: Sec. 669. All property has an owner.

Sec. 678. The ownership of property is either: 1. Absolute. 2. Qualified.

Sec. 680. The ownership of property is qualified. * * * 2. When the time of enjoyment is deferred.

Sec. 688. In respect to the time of enjoyment, interest in property is either: 1. Present or future.

Sec. 690. A future interest entitles the owner to the possession of the property only at a future period.

Sec. 741. No future interest can be  *  *  *  barred by
any  *  *  *  act of the owner of the intermediate or prece-
dent interest nor by any destruction of such precedent in-
terest by forfeiture, surrender, merger or otherwise.

II. The judgment was nothing more in law than a merely
personal judgment, because it did not contain a description
of any lands or even pretend to contain one.

Did the judgment amount to anything more than a per-
sonal judgment? Did it amount to a decree *in rem;* that is,
a decree against a particular thing? It would seem too clear
for argument that it did not, for the obvious reason that to
be a decree against a particular thing, that thing must be
described by the decree. As well proceed against a person
upon a promissory note, without naming him, and expect to
bind him, as to proceed against a particular thing, without
describing it, and expect to bind it. But it is said that while
the judgment does not even pretend to contain a description,
yet it refers to certain deeds where a description may be found,
and then it is sought to apply the maxim, "that is certain
which can be made certain."

But we contend that the description should have been con-
tained in the judgment itself, if the judgment was to bind the
land, and that the maxim, from the very nature of things,
can have no application to judgments in such matters.

In the first place, the very terms of the maxim exclude
that idea. "That is certain which can be made certain"—by
what? By evidence in an action. But a judgment is the end
of an action. The law does not pronounce judgment upon
the understanding that there is to be another action, trial and
judgment, to make the judgment being rendered an operative
judgment.

In the second place we have never yet been able, after a
very long search, to find a case where the maxim was applied
to a judgment. Consult Broom's Legal Maxims and Wharton's
Legal Maxims, and you will find nothing even hinting that
way. If the maxim is to apply at all, I suppose it must apply
in full force. Admit it to apply at all and where would you,
or could you, draw the line. For instance: "If a man make
a lease to another for so many years as J. S. shall name, this
is a good lease for years; for though it is at present uncertain,

yet when J. S. hath named the years, it is then reduced to certainty." (Broom's Leg. Max., 556.)

So, we suppose, on this principle, a mortgage of such lands "as J. S. shall name" might be a good mortgage, yet who would contend that a foreclosure by that description would be good. Suppose, in the meantime, the additional element of certainty had occurred of J. S. having named the lands, would it be contended that it would be sufficient to allege that J. S. had named the lands (but without describing them) and have the judgment decree "such lands, as J. S. hath named," sold, with no further description?

If reference to a description merely is all that is required in a decree, then a reference to a description is all that is required by the Sheriff in his proceedings; for the moment you admit that the decree does not contain a description sufficient to sell by, you admit that it is insufficient as a decree against the land; for it is self-evident that if it is good enough as a description to bind the land by the decree, it is sufficient as a description in the Sheriff's proceedings. But how could a Sheriff sell with merely a reference to a description. He might be unable to find it. It might be to deeds which were lost. What is the Sheriff to do then? Make himself a Court, subpœna witnesses, take testimony, fine for contempt the refractory witnesses who refuse to answer him as to what they knew about the description in the lost deed, and finally render judgment as to what lands were described in the deed? Or it may be that the deed is in London or Japan, or Patagonia; what is he to do then? Make himself a Court again and issue depositions to those distant countries? Even then he may not know the precise person who has control of the deed. Or is he to issue a subpœna *duces tecum* to those far away individuals returnable before his mighty highness? And even when he got the deed it might in turn refer to another deed for description, and so on *ad infinitum*. Or is he to sell with no other description than the mere reference to the description, which the decree gives him? He can not sell by that description, for he must sell each lot or parcel separately if there is more than one. (Code Civ. Pro., § 694.)

How can he know whether there are more lots than one, or what lots there are, by any light the decree gives him?

He must give the purchaser a "particular description of the real property sold." (C. C. P., § 700, Subd. 1.) Mark the words : He must give a particular description. How can he do that with nothing but a mere reference to a description in his possession? So he must post his notices in the township where the property is located. (C. C. P., § 692, Subd. 3.)

But how is he to know where the township is with nothing but a mere reference to a description in his hands? So he must levy on the property (C. C. P., § 691), which is done by filing a notice with the Recorder describing the land and posting a similar notice on the land itself. (C. C. P., § 542, Subd. 2.) How is he going to post on the land without knowing where it is? Thus we see that by any test we can apply, such a judgment is in no way superior to and amounts to no other than a merely personal judgment. See also:. *Joseph* v. *Joseph's Legatees,* 5 Ala. 280; *Turner* v. *Dupree's Adm'r,* 19 Ala. 198; *Spence* v. *Simmons,* 16 Ala. 828; *Church* v. *Chambers,* 3 Dana, 275 (C. C. P., § 577); *People* v. *Cone,* 48 Cal. 429.

Foreclosure proceedings which simply refer to a deed for description amount only to a general money judgment. Such a reference might do in a deed or mortgage, which can be made certain by pleading proof and judgment, but it will not do in a complaint or decree, which are themselves the means by which uncertain descriptions are made certain. There must be some end to uncertainties, and we think the judgment is that end. (*Clark* v. *Gage,* 19 Mich. 512–515 ; *Atwood* v. *Atwood,* 22 Pick. 287; *Flagg* v. *Bean,* 25 N. H. (5 Foster) 64–65; *Colby* v. *Collins,* 41 Id. 305; *Huddleston* v. *Garrott,* 3 Humph. (Tenn.) 630; *Crow* v. *Wood,* 13 Beavan, 271; *McManus* v. *Stevens,* 10 La. Ann. 177; *Montrose* v. *Conner,* 8 Cal. 344; *Nolte* v. *Libbert,* 34 Ind. 167 ; *White* v. *Hyatt,* 40 id. 385 ; *Struble* v. *Neighbert,* 41 id. 344; *Whittelsy* v. *Beall,* 5 Blackf. 143; *Gayle* v. *Singleton,* 1 Stew. (Ala.) 571–572, 574 ; *Jackson* v. *Rosevelt,* 13 Johns. 96 ; *Jackson* v. *Delaney,* 13 id. 535 ; *Peck* v. *Mallany,* 10 N. Y. 509; *People* v. *Cone,* 48 Cal. 429–430 ; *People* v. *De La Guerra,* 24 id. 78 ; *People* v. *Hyde,* 48 id. 431.)

It is urged that all these cases arose upon demurrer or ap-

peal.    This is not true.    But if it were, what difference would
that make?

A description is either sufficient or it is not.    If it is, it is
not the subject of attack by demurrer, appeal, or otherwise.
If it is not, then it is no description.

ROSS, J.:

The action is ejectment, and the premises a part of a Mexi-
can grant, for which a patent was issued by the United States
Government on the nineteenth day of February, 1868.    The
plaintiff is the daughter and one of the heirs of S. J. Crosby,
deceased.    Crosby owned the land at the time of his death,
which occurred March 29, 1859.    When he died his daughter
was but a little more than a month old.    Crosby's possession
of the property was not invaded during his life-time.    Had
it been, and had the Statute of Limitations been set in mo-
tion during that period, its running would not, of course, have
been arrested by the subsequent disability of the plaintiff.
But this was not the case.    When Crosby died, his title to an
undivided interest in the property descended to and vested in
the plaintiff.    She then became, with her co-tenant, entitled
to its possession.    But she was then a minor, incapable of
vindicating or asserting her right.    Around her, therefore, the
law threw its protection.    If there had then been an invasion
of her possession, there can be no doubt that she would have
been entitled to the statutory period of five years after attain-
ing her majority within which to have asserted her right by
action.    (C. C. P., § 328.)    With the descent of the title came
the protection of the law.    What removed that protection?
It is said that subsequent administration upon the estate of
the ancestor did so.    Administration upon that estate was
had, although the precise date when it was commenced does
not appear.    Letters of administration were, however, issued
to one Reed prior to the year 1860.    Reed tendered his resig-
nation of the office June 28, 1860, and it was accepted on the
eleventh of August of the same year.    Beach succeeded Reed
as administrator by appointment made May 8, 1866, and he
resigned April 2, 1870.    From April 2, 1870, to January 3,
1876, there was no administrator; but upon the last-named
day one Smith was appointed.    During all this time the

plaintiff continued a minor. What is relied on by the appellant as adverse possession of the premises commenced in the year 1866. The patent, as already said, issued February 19, 1868. At both of the last-mentioned dates there was an administrator of the estate of S. J. Crosby, deceased, in office, and the appellant's claim is, that as, under our law, the administrator alone was then entitled to the possession of the property, it was his right alone, as well as his duty, to have commenced an action for the recovery of the possession from the adverse possessor; that the Statute of Limitations commenced to run upon the issuance of the patent, and five years thereafter all rights on the part of the administrator, as well as of the infant heir of Crosby, became barred. If such is the necessary result of the provisions of law, it is a hard result, as must be apparent to every one. There is no provision of 'law requiring the administrator to give security based upon the value of the real property of the deceased.

Under the law in existence when the alleged ouster in this case occurred, and when it is claimed the Statute of Limitations began to run, the sole right to the possession of the property was in the administrator; and prior to January 1, 1873, the heir could not maintain an action for the recovery of the possession of the property, even though there was a vacancy in the administration. (*Chapman* v. *Hollister*, 42 Cal. 462.) So that the result of appellant's position would be to divest the title of an infant heir by means of an adverse possession, commenced and held at a time when the heir was not only incapable of asserting her rights by reason of infancy, but was absolutely prohibited by law from asserting them, and when, too, there was no one in existence charged with the right or duty of protecting them. The circumstances of the present case well illustrate the wrong that would result from such a construction of the law.

At the time it is claimed the Statute of Limitations began to run—February 19, 1868—the plaintiff was less than ten years old. It is true there was then an administrator of the estate of her ancestor, in the person of Beach, and that he could have commenced and maintained an action against the intruder for the possession of the property. But on the second of April, 1870, a vacancy in the administration occurred,

and that vacancy continued until after the lapse of five years from the nineteenth of February, 1868. During this time there was no one in existence capable of bringing the action. There was no administrator, and the plaintiff was not only disqualified by reason of her minority, but she was prohibited by law from doing so. She was likewise legally incompetent to cause the appointment of an administrator to represent the estate, as well as to compel action, if there had been one. It would be a law with very little justice in it that would permit an infant's property to be divested by adverse possession held under such circumstances. Fortunately, we are convinced, after careful consideration, that the terms of our statute do not compel us to so hold. Engrafted upon the provisions prescribing the time of commencement of actions for the recovery of real property, is an exception in these words: "If a person entitled to commence an action for the recovery of real property, or for the recovery of the possession thereof, or to make any entry or defense founded on the title of real property, or to rents or services out of the same, be, at the time such title first descends or accrues, either:

"1. Within the age of majority; or 2. * * * The time during which such disability continues is not deemed any portion of the time in this chapter limited for the commencement of such action, or the making of such entry or defense, but such action may be commenced, or entry or defense made, within the period of five years after such disability shall cease, or after the death of the person entitled who shall die under such disability; but such action shall not be commenced, or entry or defense made, after that period." (C. C. P., § 328.)

If it be true, as it undoubtedly is, that had the plaintiff's possession of the premises been invaded the day the title thereto first descended to her—when she was less than two months old—the time elapsing between the ouster and the attainment of her majority could not have been deemed any portion of the time limited for the commencement of an action by her for the recovery of the possession, but that she would have been allowed the period of five years after the removal of her disability within which to have commenced

such action, no reason is perceived why the same is not also true where the adverse entry takes place on any other day during the existence of the disability. Precisely the same reasons for the protection intended by the law exist in the one case as in the other, and we are persuaded that where the protection once attaches it continues until the disability is removed.

Our conclusion on this branch of the case is strengthened by the consideration of other provisions of our statutes.

As observed already, prior to January 1, 1873, the heir was prohibited by statute from maintaining an action for the recovery of the possession of the property (the title to which was in her), pending administration upon the estate of the ancestor, and this, though there was a vacancy in the administration. Yet the statute, in prescribing the requirements of the administrator's bond, made no provision for security on his part for the protection of the interest of the heir in the real property of the estate. It is not to be supposed that had the Legislature intended the Statute of Limitations to run against the title of the heir, whom it prohibited from suing for the possession, because it conferred on the administrator that right temporarily, would not have required of the administrator adequate security for the protection of the rights of the heir.

A further statutory provision in support of the same view is found in Section 356 of the Code of Civil Procedure, which reads:

"When the commencement of an action is stayed by injunction or statutory prohibition, the time of the continuance of the injunction or prohibition is no part of the time limited for the commencement of the action."

The statutory prohibition against the maintenance by the heir of an action for the recovery of the real property of the estate was removed January 1, 1873, by the taking effect of the Codes, Section 1452 of the Code of Civil Procedure, providing that "the heirs or devisees may themselves, or jointly with the executor or administrator, maintain an action for the possession of the real estate, or for the purpose of quieting title to the same, against any one except the executor or administrator;" and on April 16, 1880, this section was

amended by adding the words: "But this section shall not be so construed as requiring them so to do."

Even if it could be held that the Statute of Limitations commenced running against the plaintiff on the first day of January, 1873, when the statute for the first time conferred upon her the right to maintain an action for the recovery of the property, it had not fully run on the twenty-first day of April, 1877, when the present action was commenced. But, for the reasons already stated, we are satisfied that the plaintiff's rights were saved by the provisions of Section 328 of the Code of Civil Procedure, and that she was lawfully entitled to the period of five years after attaining her majority within which to assert them.

Another defense relied on to defeat the action is title claimed to have been acquired by the defendant through certain foreclosure proceedings. The land directed to be sold is thus described in the decree of foreclosure, as also in the complaint in the action and in the mortgage itself:

"All of that part of the rancho situated in the county of Santa Clara, in the State of California, called the Santa Rita, described in the three following deeds, to wit: In a deed dated February 15, 1865, from Secundino Robles and Antonia Garcia, his wife, Miguel Espinosa, Jesus Robles, his wife, to Samuel J. Crosby, filed for record in the County Recorder's office of Santa Clara county, on the sixteenth day of February, 1855, and recorded in Book 'H' of Deeds, page 405, and re-recorded March 10, 1855, and in Book 'G' of Deeds, page 477; also, a deed dated May 5, 1855, from one Teodoro de Jesus Robles to Samuel J. Crosby, filed for record in said Recorder's office May 7, 1855, and recorded in Book 'G' of Deeds, page 509; and also, a deed dated this tenth day of March, 1856, from Don Teodoro de Jesus Robles to Samuel J. Crosby, filed for record in said Recorder's office on the eleventh day of March, 1856, and recorded in Book 'K' of Deeds, page 188, to which deeds reference is made for a more particular description of the premises."

It will be thus seen that the only description of the property directed to be sold is such as may be found in three certain deeds, to which reference is made. Neither in the decree, in the complaint, nor in the mortgage itself, is there

any pretense of a description of the property, but only a reference to certain deeds for a description. Assuming that the deeds could be found, or, in the event that they could not be found, that reference could be made to the *record* of them, the descriptive calls there found might prove, on examination, to be wholly indefinite, or so vague as to leave it doubtful what lands they included.

The primary purpose of an action of foreclosure is to enforce a lien upon certain specific premises. The first step in that proceeding, under our system, is the filing of a complaint. That complaint must contain a description *prima facie* at least sufficient for the identification of the property. There must be such a basis for the decree that is to follow to rest on. While it is generally sufficient to describe the premises as they appear in the mortgage itself, this is only so when the mortgage itself contains a description—not where, as here, the mortgage contains *no* description, but only a reference therefor to other instruments, from which a description may or may not be obtained. (2 Jones on Mortgages, Section 1,462, and authorities there cited.) If the description contained in the mortgage involved in *Overfeldt* v. *Crosby* was susceptible of being made definite and certain, that ought to have been done in the action foreclosing the mortgage. The decree should have put an end to all such uncertainties, and should have described the land directed to be sold with sufficient certainty for its identification. The degree of certainty sufficient in a deed of conveyance, would, as said by Chief Justice Shaw, in *Miller* v. *Miller*, 16 Pick. 215, often be insufficient in a legal process, because in the former an indefinite description may be made good by evidence *aliunde.*

In *Clark* v. *Gage*, 19 Mich. 507, which was a proceeding instituted to recover the possession of land in a summary manner, pursuant to the statutes of the State, the Court referred to the cases of *Miller* v. *Miller, supra*; *Atwood* v. *Atwood*, 22 Pick. 283; and *Flagg* v. *Bean*, 5 Foster, (N. H.), 49, and said: " Without adopting the extreme view that the description required in a complaint should be so explicit as to enable the Sheriff to deliver possession without reference to any extrinsic facts, it is believed that the principle prevading these cases

is a clear and correct authority for holding that the certainty requisite in a complaint in this class of cases is not attained by a bare reference to a deed or other instrument; and further, that such reference when made will not have the effect to help an otherwise insufficient description. It is not possible to define with perfect exactness the kind of description which will suffice in all cases, but it may be stated as a general rule that it should be so precise as *prima facie* to give to the defendant who is to answer to the complaint, the tribunal appointed by law to decide upon it, and the officer who may be required to put a complainant in possession, a distinct idea of the very premises. The degree of precision which is here indicated may be attained, and yet from the nature of the subject-matter and its surrounding objects, the officer on executing a writ of restitution or possession may find it necessary to instruct himself in local circumstances in order to act correctly. But any necessity of that kind would result from unavoidable difficulties belonging to the subject-matter, and not from any defect in the proceedings on paper."

There is as much necessity for a description of the property sought to be charged with a lien as there is in a case the object of which is to recover possession of the property; and as much necessity for a description in the decree as in the complaint. (See, also, Freeman on Judgments, Section 54; *Lawless* v. *Barger*, 9 Bush (Ky.), 665; *Runyon* v. *Darnall*, 10 id. 67; *Struble* v. *Neighbert*, 41 Ind. 344.)

Our conclusion is that the defendants acquired no title under the foreclosure proceedings of *Overfeldt* v. *Crosby.*

Whether plaintiff could recover the entire premises if defendant Clark had by adverse possession extinguished the title of the plaintiff's co-tenant, and himself thereby acquired title to the interest theretofore owned by the co-tenant, is a question that need not be considered in this case, since it does not appear, either in the findings or proof, that Clark has ever held adverse possession of the premises as against the plaintiff's co-tenant.

The bill of exceptions recites:

"The only evidence in addition to the documentary evidence upon which the findings are based, as to the adverse

possession of the defendant Clarke, or as to any title or claim of title under which he held and occupied, was the following testimony of the defendant Jeremiah Clarke: The defendant, Patrick Dowd, entered in possession of that portion of the premises in dispute, which was in his possession at the commencement of this action, under a lease from me about the first day of October, 1866, and he has remained in possession ever since. He has never surrendered the possession since his first entry under the lease from me. The description in the deeds referred to for description in the decree in *Overfeldt* v. *Crosby,* embraces the same premises described in the Sheriff's deed to Overfeldt, and all the premises sued for in this case, except the 'Mayfield Farm.' Previous to my purchase from Overfeldt, I had adverse possession of a portion of the land not in the possession of S. J. Crosby. My recollection does not serve me whether, in my transaction with the administration of Mr. Crosby's estate, I recognized the eighty acres which I had the possession of before, and which was not in possession of Crosby in his life-time, as part of the land for which I paid him rent or not. But all my relations with the administrator were perfectly friendly, and I never claimed adversely to anything he claimed. I paid him such rent as he proposed.

"The eighty acres spoken of was a piece that Mr. McGarrahan had in possession and kept Crosby out of. I received possession of this eighty acres from defendant Dowd in the fall of 1858. I do not recollect whether I took any written lease from Reed, the administrator of the Crosby estate, or not. Nor do I recollect that anything was said about this eighty acres. It is very likely it was included in the lease from Reed, and that I paid him rent for it. I do not know that he or I thought about the eighty acres that McGarrahan and Dowd had held adversely to Crosby, the possession of which I received from Dowd. We simply agreed how much I was to pay, having reference to the time when possession should be taken under the Overfeldt purchase."

Judgment and orders affirmed.

McKINSTRY, J., MORRISON, C. J., and THORNTON, MYRICK, and SHARPSTEIN, JJ., concurred.

McKEE, J., dissenting:

I concur with the views expressed in the prevailing opinion upon the question of the Statute of Limitations; but I dissent from those expressed upon the subject of the description of the mortgaged premises in the decree of foreclosure. It is conceded that the description of the land in the mortgage, and in the foreclosure proceedings, was sufficient (*Vance* v. *Fore*, 24 Cal. 435; *Penry* v. *Richards*, 52 id. 672; *Stanley* v. *Green*, 12 id. 148; *Caldwell* v. *Center*, 30 id. 539; *Kimball* v. *Semple*, 25 id. 440); and I do not understand how its transmission into the decree of foreclosure changed it into a nullity.